QUINN EMANUEL
URQUHART & SULLIVAN, LLP
Peter J. Armenio
Matthew D. Robson
Seung Woo Hur
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

QUINN EMANUEL
URQUHART & SULLIVAN, LLP
Michelle A. Clark
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700

QUINN EMANUEL
URQUHART & SULLIVAN, LLP
Miles D. Freeman
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Defendant InAuth, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| mSIGNIA, Inc.<br><br>       Plaintiff,<br><br>     vs.<br><br>InAuth, Inc.<br><br>       Defendant. | Case No. 8:17-cv-01289-AG-KES<br><br>**DEFENDANT INAUTH, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**<br><br>Date: December 17, 2018<br>Time: 10:00 a.m.<br>Hon. Andrew J. Guilford<br>Courtroom 10D |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................... 1

II.     BACKGROUND ...................................................................................... 4

    A.    The Asserted Claims ...................................................................... 4

    B.    The Court's Claim Construction Order.......................................... 5

        1.    "Information Regarding Anticipated Changes to One or More of the Stored Data Values Associated with that Identity" ........................................................................ 5

        2.    The Requirement That "Information Regarding Anticipated Changes to One or More of the Stored Data Values Associated with that Identity" Be "Stored for an Identity" ............................................................................... 6

    C.    The V3 Prototype ........................................................................... 8

        1.    The May-June 2017 Beta Test...................................... 8

        2.    The Undisputed Material Facts Regarding Technical Operation of the V3 Prototype........................................ 8

III.    THE SUMMARY JUDGMENT STANDARD ............................................. 11

IV.     ARGUMENT ......................................................................................... 12

    A.    The V3 Prototype Does Not Infringe Any Asserted Claim Because It Did Not Store Any "Information Regarding Anticipated Changes" ................................................................ 12

    B.    The V3 Prototype Does Not Infringe Any Asserted Claim Because The Alleged Information Regarding Anticipated Changes Is Not "Stored for an Identity" Or "Associated with" Any Identity .................................................................... 15

    C.    The V3 Prototype Does Not Infringe Any Asserted Claim Because It Does Not Include Functionality For "Recognizing That The Presentation Of Identity Information By The Computer Is Authentic" Or Is Not Authentic ....................................... 17

    D.    mSIGNIA Has Failed To Show Infringement Under The Doctrine Of Equivalents And Any Indirect Infringement ................... 18

V.      CONCLUSION ..................................................................................... 18

-i-

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ..............................................................................11

*Bird Barrier Am., Inc. v. Bird-B-Gone, Inc.,*
   676 F. Supp. 2d 929 (C.D. Cal. Dec. 16, 2009) ...............................11, 12

*Cambrian Sci. Corp. v. Cox Commc'ns, Inc.,*
   No. 11-01011, 2014 WL 12597150 (C.D. Cal. Jun. 13, 2014)...............12

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ..............................................................................11

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,*
   381 F.3d 1111 (Fed. Cir. 2004).............................................................11

*MyMail, Ltd. v. Am. Online, Inc.,*
   476 F.3d 1372 (Fed. Cir. 2007).............................................................12

*Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.,*
   206 F.3d 1408 (Fed. Cir. 2000).............................................................17

## Statutory Authorities

35 U.S.C. § 285........................................................................................18

## Rules and Regulations

Fed. R. Civ. P. 56........................................................................................1

Fed. R. Civ. P. 56(c) .................................................................................11

Local Rule 54-10 .......................................................................................18

Local Rule 56...............................................................................................1

-ii-

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, Defendant InAuth, Inc. ("InAuth") respectfully submits this memorandum in support of its motion for summary judgment of non-infringement.

## I.   INTRODUCTION

mSIGNIA abandoned all but one of its infringement claims after the parties appeared before the Court at the June 2018 Claim Construction Hearing.  At that time, mSIGNIA asserted that every commercial product made and sold by InAuth (seven products, accounting for all of InAuth's revenue), as well as one prototype product (the "V3 prototype") infringed the one patent-in-suit, U.S. Patent No. 9,559,852 (the "'852 patent").  Statement of Uncontroverted Facts and Conclusions of Law ("SUF") ¶ 8.  The accused commercial products were InMobile, InBrowser (V2), InRisk, InReach, InAuthenticate, InExchange, and InPermID ("InAuth Commercial Products").  *Id.* ¶ 8.  But, as InAuth explained to mSIGNIA throughout this litigation, InAuth's products could not infringe because they did not store for an identity or associate with an identity any "information regarding anticipated changes" to device data values, as required by the claims.  As the Court held in the June 6, 2018 Claim Construction Order, under the plain meaning of "information regarding anticipated changes," this term is "directed to something different than using backwards-looking information about changes after they occur to make an evaluation."  Dkt. 43 at 9.  InAuth's products are purely backwards-looking and evaluate changes only after they occur, and thus cannot infringe.

Conceding as much, at least with respect to the InAuth Commercial Products, mSIGNIA withdrew *all* of its infringement claims against these products on September 26, 2018, the day before its infringement expert report was due.  SUF ¶ 10.  mSIGNIA notified InAuth it only intended to proceed to trial on its infringement claim against the V3 prototype.  SUF ¶ 10.

InAuth respectfully submits that the V3 prototype, like the InAuth Commercial Products that mSIGNIA originally accused and then withdrew its

1  allegations against, does not infringe any asserted claim of the '852 patent.
2  Accordingly, InAuth respectfully requests entry of summary judgment of non-
3  infringement.

4       The V3 prototype was an experimental software functionality InAuth briefly
5  beta tested with three customers during May and June 2017.  The V3 prototype was
6  designed to assign identifiers to web browsers.  It would evaluate various attributes
7  of a web browser and determine whether the browser is one the system had seen
8  before (and thus should be given its previously assigned identifier) or one that it had
9  not seen before (and thus should be given a new identifier).  The V3 prototype failed
10 its beta test, producing unacceptable delays and performance worse than InAuth's
11 admittedly non-infringing InBrowser V2 product that it sells today.  The V3
12 prototype suffered from large delays because it would perform a backwards-looking
13 analysis that compared the presented browser information to a large amount of
14 historical information, and that comparison unavoidably made the system slow.  The
15 V3 prototype was scrapped after its beta test and, as is undisputed, was never sold to
16 a single customer.

17      The V3 prototype does not infringe any asserted claim of the '852 patent for
18 the same reasons the InAuth Commercial Products do not:  (1) it did not store
19 "information regarding anticipated changes" to any data values; (2) it did not store
20 any such information "for an identity" or "associated with" any identity; and (3) it
21 did not include functionality for "recognizing that the presentation of identity
22 information by the computer is authentic" or is not authentic.

23      *First*, the V3 prototype did not store any "information regarding anticipated
24 changes" because it was a purely backwards-looking system.  The V3 prototype
25 would receive current attribute values for a browser to be identified and compare
26 them with previously recorded attribute values for a browser the system had seen
27 before to determine which attribute values, if any, did not match the historical
28 values.  It then consulted a static look-up table (the "V3 target table") that told the

system whether the browser was a new or returning browser, given the number and type of backwards-looking mismatches observed.

The only alleged "information regarding anticipated changes" identified by mSIGNIA in connection with the V3 prototype is the V3 target table.  But the V3 target table contains no stored predictions or other information regarding anticipated changes to a browser's attribute values.  It is simply a type of "grading sheet" that tells the system what to do (assign a new ID or a previously stored one) based on which attributes did and did not match their previously stored value after a backwards-looking comparison.  Critically for this motion, the V3 prototype only evaluated changes *after* they occurred to determine which attributes matched and which did not match historical values.  mSIGNIA's claims, as the Court has already found, are directed to something different from a backwards-looking system that evaluates changes only after they occur.  Accordingly, the V3 prototype does not infringe.

*Second*, even if the V3 target table were "information regarding anticipated changes" (which it is not), mSIGNIA's infringement claims are still fatally flawed given that mSIGNIA has not – because it cannot – presented any evidence that the V3 target table is "stored for an identity" or "associated with" any identity.  As mSIGNIA's expert has admitted, there was just one, single target table in the V3 prototype – regardless of how many identities there were.  And the V3 target table applied just the same across all those identities.  There was no identity-specific information in the V3 target table, nor was it linked to, associated with, or otherwise "stored for" an identity in any manner.  Accordingly, the V3 prototype cannot satisfy the claim terms requiring that the information regarding anticipated changes is "associated with" or "stored for an identity."

*Third*, the V3 prototype did not include functionality for "recognizing that the presentation of identity information by the computer is authentic."  Indeed, that was not the purpose of the V3 prototype.  Any "presentation of identity information by

the computer" was assigned an identifier by the V3 prototype (either a new one or a previously stored one).   It could not reject a browser as inauthentic; it always assigned an identifier.   And, in any event, there is no dispute that the V3 prototype was never used by any beta test customer to actually authenticate any user.

For all these reasons, as discussed in more detail below, InAuth respectfully requests that the Court grant its motion for summary judgment that the V3 prototype does not infringe any asserted claim of the '852 patent.

## II.   BACKGROUND

### A.   The Asserted Claims

The asserted claims of the '852 patent are Claims 1-6, 13-15, 20, 22, 23, and 25 (the "Asserted Claims").   Only two independent claims are asserted, Claims 1 and 25.   Claim 1 is exemplary and excerpted below, with the claim terms most pertinent to this motion bolded:

1. An identity recognition system comprising:

a non-transitory memory *storing information associated with one or more identities*, wherein *the information stored for an identity includes*

(a) data values associated with that identity; and

(b) *information regarding anticipated changes to one or more of the stored data values associated with that identity*;

one or more hardware processors in communication with the memory and configured to execute instructions to cause the identity recognition system to recognize that the presentation of identity information by a computer is authentic, by performing operations comprising:

generating a challenge to the computer, wherein the challenge prompts the computer to provide a response based on one or more data values from the computer that correspond to one or more of the stored data values associated with the identity;

receiving, from the computer, the response to the challenge;

-4-

determining whether the response is allowable, wherein such determining comprises using the stored information regarding anticipated changes to the stored data values associated with the identity to determine whether a data value used to form the response is based on an acceptable change to a corresponding stored data value; and

***recognizing that the presentation of identity information by the computer is authentic***, according to whether the computer has provided an allowable response to the challenge.

The remaining Asserted Claims are set forth in full in the SUF filed herewith. SUF ¶¶ 18-31.

### B.    The Court's Claim Construction Order

1.    *"Information Regarding Anticipated Changes to One or More of the Stored Data Values Associated with that Identity"*

The Court addressed six terms of the Asserted Claims in its Claim Construction Order.  Dkt. 43.  With respect to the claim term  "information regarding anticipated changes to one or more of the stored data values associated with that identity," the Court held that required no construction and, accordingly, has its plain and ordinary meaning.  *Id.* at 10.  The Court also provided guidance on the plain and ordinary meaning of this term, noting that the term is "directed to something different than using backwards-looking information about changes after they occur to make an evaluation."  *Id.* at 9.

As the Court noted, InAuth contended during the claim construction proceedings that this aspect of the term was relevant because its accused products "only use information gathered *after* the changes have been recognized, rather than predicting changes before they occur."  Dkt. 43 at 9 (emphasis in original).  InAuth explained that it was concerned mSIGNIA's infringement allegations would create "mischief" and seek to read the "information regarding anticipated changes" limitation on products that only engage in a backwards-looking analysis.  *Id.* at 9.

During the Claim Construction hearing, the Court asked mSIGNIA's counsel whether mSIGNIA agreed that the plain meaning of the "information regarding anticipated changes" limitation "excludes solely evaluating changes after they occur," and mSIGNIA's counsel agreed.  SUF ¶ 32 (Dkt. 44 (Transcript of Claim Construction Hearing, June 6, 2018) at 17:21-18:8).

As the Court noted, mSIGNIA also distinguished the Etchegoyen prior art reference on the basis that it "does not rely on information regarding anticipated (*i.e.*, predicted, foreseen, expected) changes to a specific data value; instead, Etchegoyen gives rules on what changes are *acceptable* to the group as a whole, but without actually *anticipating* any changes for any of the stored data values."  Dkt. 43 at 7 (emphasis in original).

> 2.   *The Requirement That "Information Regarding Anticipated Changes to One or More of the Stored Data Values Associated with that Identity" Be "Stored for an Identity"*

The term "information regarding anticipated changes to one or more of the stored data values associated with that identity" appears in the limitation of the independent claims that specifies what information the claimed system must "store for an identity."   There is no dispute that, consistent with the Court's Claim Construction Order, this limitation is to be given its plain and ordinary meaning. The full limitation, as it appears in Claim 1, is set forth below:

> a non-transitory memory **storing information associated with one or more identities, wherein the information stored for an identity** includes (a) data values associated with that identity; and (b) information regarding anticipated changes to one or more of the stored data values associated with that identity;

Ex. A, '852 patent, Claim 1 (emphasis added).  (Exhibits cited in this Memorandum are in reference to the Exhibits to the Declaration of Matthew D. Robson, filed concurrently herewith, unless stated otherwise).

Under the plain meaning of this limitation, it specifies storing certain information "associated with one or more identities."  The "wherein" clause then expressly requires that the information "stored for an identity" include two specific

-6-

types of information:  (a) data values associated with that identity; and (b) information regarding anticipated changes to the data values associated with that identity.

Storage of these two types of information for an identity is shown in Figure 2 of the '852 patent, which depicts the databases used by the alleged invention.  The stored information of (a) is shown in the Minutia DB (DB meaning database) **70**, and the corresponding stored information of (b) is shown in the Anticipated Minutia DB **98**:



Ex. A, '852 patent, Fig. 2 (annotated).

The Minutia DB **70** stores the "Current Device Image" for a particular device, including current hardware data values (*e.g.*, serial number), firmware data values (*e.g.*, operating system version), and/or software data values (*e.g.*, names of applications the user has installed).  *Id*. at 11:30-46. The Anticipated Minutia DB **98** stores predicted future values for each of the data values stored for the identity in Minutia DB **70**.  For example, for each of the 280 software data values stored for a particular computer in Minutia DB **70** (shown as S1-S280), predicted specific future values for these data values are stored in the Anticipated Minutia DB (*e.g.*, S1A, S1B, etc.).

To determine whether device data corresponds to that of an authentic device/user, the system compares current device minutia to corresponding entries stored in the Anticipated Minutia DB to determine whether the current data values conform to the stored predicted future values. *Id.* at 13:15-22. If the current device data values match the anticipated data values for that particular device/user, then the device/user may be authenticated. But if the current device data values do not match the anticipated data values for that particular device/user, "then a validation failure process as described in FIG. 6B can alert the service provider 14 that the validation has failed." *Id.* at 18:1-3.

## C.    The V3 Prototype

### 1.    *The May-June 2017 Beta Test*

The V3 Prototype was beta tested in May and June of 2017 with three InAuth customers. SUF ¶ 33. The V3 prototype produced unacceptable performance delays and was abandoned in June 2017. SUF ¶¶ 35-42. The V3 prototype suffered from large delays because it had to compare current data values to large amounts of historical data, and that comparison unavoidably made the system slow. SUF ¶¶ 39-41.

### 2.    *The Undisputed Material Facts Regarding Technical Operation of the V3 Prototype*

InAuth made the full source code base for the V3 prototype available for inspection by mSIGNIA as of January 4, 2018. SUF ¶ 45. There can be no genuine dispute as to any material fact regarding how the V3 prototype works, given that both sides have had access to the source code, which describes how all aspects of the V3 prototype operated.

The V3 prototype was designed to assign an identifier, called an InBrowserID, to a browser. SUF ¶ 46. If the V3 prototype worked, InAuth could then provide this identifier to an InAuth customer (*e.g.*, a company with an internet website that permits commercial transactions). The customer, in turn, could use the

identifier as part of its broader authentication process to determine whether to allow the browser to engage in a transaction.  SUF ¶ 47.  It is undisputed, however, that no InAuth customer during the beta test, or any other time, actually used the V3 prototype, or any InBrowserID issued by the V3 prototype, to authenticate a user or transaction.  SUF ¶ 48.

The V3 prototype used a database to store certain historical information associated with each InBrowserID.  SUF ¶ 50.  Specifically, each InBrowserID was linked to and associated with the observed data values obtained from a particular browser when it last accessed the system and was assigned the InBrowserID.  SUF ¶ 51.  The V3 target table is not stored in the database containing InBrowserIDs and their associated data values.  SUF ¶ 53.  It is not associated with, connected to, or linked to in any manner any specific InBrowserID.  SUF ¶ 54.

The V3 prototype would receive from a browser to be evaluated current data values for various attributes of the browser (*e.g.*, observed fonts and IP address).  SUF ¶ 52.  It would then look backwards to determine whether the browser was one the system had seen before, or was a new browser it had not seen before.  SUF ¶¶ 55-57.  If a browser accessing the system was determined to be a new browser the system had not seen before, the V3 prototype was designed to return a new InBrowserID.  SUF ¶ 57.  If, on the other hand, the data values were determined to correspond to a browser the system had seen before, the InBrowserID previously assigned to the browser would be returned.  SUF ¶ 56.

The V3 prototype made this determination in two general steps:

*First*, after the V3 prototype received a collected set of attributes for a browser (referred to as an "observation"), it would look backwards to compare them to previously stored past observations for browsers the system had seen before.  SUF ¶¶ 58-60.  The V3 prototype would attempt to find a historical observation in its database that matched all of the pertinent attribute values exactly.  SUF ¶ 60.  If

such a historical observation was found, the V3 prototype returned the stored InBrowserID of the most recent such historical observation.  SUF ¶ 61.

In the event certain attribute values of the observation matched a prior observation, while certain others did not, the V3 prototype would determine which specific attributes did and did not match the historical values.  SUF ¶¶ 62-64.  In this way, it would build what is called a "difference vector," which is a way of showing which attributes for the browser being evaluated did and did not match a historical observation stored in the database.  SUF ¶ 64.

The V3 prototype generated a difference vector by looking backwards to compare the values of 21 specific attributes in the observation to the historical value of each, attribute-by-attribute, to see if each individually matched or did not match history.  SUF ¶¶ 62-64.  The V3 prototype recorded a "0" in the difference vector if an attribute (*e.g.*, IP address) matched exactly or a "1" if it did not match.  A difference vector was thus a list of 0's and 1's, representing which attributes did and did not match history.  SUF ¶ 64.

*Second*, the V3 prototype would determine whether the observation corresponded to a new or returning browser based on which attributes matched and which did not match their historical values.  It did so by consulting the V3 target table.  SUF ¶ 65.  The V3 target table is a static set of instructions on whether to conclude that the browser being evaluated is a new or returning browser, based on which attributes did and did not match (*i.e.*, the difference vector).  SUF ¶¶ 65-70.

The V3 prototype had only one target table.  SUF ¶ 79.  The single target table applied to all identities in the same way and was not individualized for any particular browser or user.  SUF ¶ 80.

In response to receipt of identity information (a browser observation), the V3 prototype was designed to ***always*** return an InBrowser ID for the browser (either a new ID or a previously stored ID).  SUF ¶ 77.  The V3 prototype did not include any

functionality for determining whether the identity information was authentic or inauthentic and, therefore, always assigned an InBrowserID.  SUF ¶ 78.

The V3 prototype was never sold to a customer.  SUF ¶ 44.  During the beta-testing of the V3 prototype, the three InAuth customers involved in the beta-testing continued to use the commercial V2 InBrowser product.  SUF ¶ 43.

## III.   THE SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure authorize entry of summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "Material facts are those necessary to the proof or defense of a claim, as determined by reference to the substantive law."  *Bird Barrier Am., Inc. v. Bird-B-Gone, Inc.*, 676 F. Supp. 2d 929 (C.D. Cal. Dec. 16, 2009).

When a motion for summary judgment is properly supported by documentary and testimonial evidence, the nonmoving party may not rest upon the allegations or denials of its pleadings, but must instead present significant probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.").

A determination of patent infringement involves a two-step process.  "First, the court determines the scope and meaning of the patent claims asserted. . . . Second, the properly construed claims must be compared to the accused device." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys*., 381 F.3d 1111, 1115 (Fed. Cir. 2004).  "Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper 'either by providing evidence that would preclude a finding of infringement, or by

-11-

showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case.'" *Cambrian Sci. Corp. v. Cox Commc'ns, Inc.*, No. 11-01011, 2014 WL 12597150, at *14 (C.D. Cal. Jun. 13, 2014). Where the operation of the accused product is not disputed, the infringement analysis "reduces to a question of claim interpretation and is amenable to summary judgment." *MyMail, Ltd. v. Am. Online, Inc.,* 476 F.3d 1372, 1836 (Fed. Cir. 2007).

## IV.  ARGUMENT

Summary judgment should be granted that the V3 prototype does not infringe any Asserted Claim for three reasons:  (1) the V3 prototype did not store any "information regarding anticipated changes"; (2) the V3 prototype did not store any such information in association with or "for an identity"; and (3) the V3 prototype did not include any functionality for performing the step of "recognizing that the presentation of identity information is authentic . . . ."  Each of these reasons standing alone would warrant summary judgment of non-infringement. *See, e.g.*, *Bird Barrier Am., Inc.*, 676 F. Supp. 2d at 931 ("If the plaintiff cannot prove that the defendant's device has every claim limitation, summary judgment should be granted in the defendant's favor.").  Together, these three reasons provide more than sufficient basis for summary judgment of non-infringement.

### A.    The V3 Prototype Does Not Infringe Any Asserted Claim Because It Did Not Store Any "Information Regarding Anticipated Changes"

The V3 prototype does not, and cannot, infringe any Asserted Claim because it did not store any "information regarding anticipated changes to one or more of the stored data values associated with that identity."  The only alleged such information is the V3 target table. *See* Ex. D, Opening Expert Report of Michael T. Goodrich, Ph.D. ("Goodrich Opening Report") ¶ 136 ("In particular, the V3 target table, which I described in Section VI above and which includes the difference vectors and target vector, satisfy this limitation.").  But the V3 target table cannot constitute "information regarding anticipated changes" under the plain meaning of that term.

-12-

*First*, the V3 target table constitutes "backwards-looking information about changes after they occur to make an evaluation," which is outside the scope of the plain meaning of "information regarding anticipated changes," as clarified by the Court.  As discussed above, each difference vector in the V3 target table is simply information on which attributes did and did not match historical data values.  There is no dispute on this fact.  Indeed, mSIGNIA's expert Dr. Goodrich admitted this fact during his deposition, when asked what the "1s" and "0s" for the difference vectors of the V3 target table represented:

> Q.   Okay.  And so if that represents time.tz as an attribute -- and I'm thinking time zone -- that means that time.tz was not a match as compared to the last time zone that was logged; right?
>
> A.   That's right.
>
> Q.   Okay.  Not a match.  It doesn't proffer any prediction as to what time zone the user is supposed to be in, but it tells you the time zone was not a match from the last time; right?
>
> A.   That's what that 1 indicates, yes.

SUF ¶ 70 (Ex. E, Goodrich Dep., Tr. at 214:9-215:4).  The V3 prototype made a backwards-looking comparison between the present and the past, not between the present and any previously anticipated future.  After determining which attributes matched and did not match their last recorded value, the V3 prototype consulted the V3 Target Table, which told it whether the browser was a new one or returning one. SUF ¶ 65.  The V3 Target Table is in this way a "grading sheet" that instructed the system to assign a new ID or a previously stored one based on the number and kind of mismatches.  This is a purely backward-looking analysis and cannot infringe.

The V3 prototype's evaluation of any changes to data values necessarily was made only *after* the relevant changes occurred.   SUF ¶ 75 (Ex. F, Traynor Rebuttal Report at ¶ 176).  The V3 Prototype would identify the changes *after* they occurred and use the V3 target table to determine if they were of such a number and kind that the browser should be assigned a new or previously stored ID.  As mSIGNIA's counsel agreed in response to the Court's question during the Claim Construction

hearing, the plain meaning of the "information regarding anticipated changes" term excludes solely evaluating changes after they occur, and therefore the V3 prototype cannot infringe.

*Second*, as the Court noted in its Claim Construction order, mSIGNIA distinguished from its claims prior art that "does not rely on information regarding anticipated (i.e., predicted, foreseen, expected) changes to a ***specific data value***" and that instead "gives rules on what changes are ***acceptable to the group as a whole***, but without actually anticipating any changes for any of the stored data values." Dkt. 43 at 7 (emphases supplied).  There is no dispute that the V3 prototype "does not rely on information regarding anticipated (i.e., predicted, foreseen, expected) changes to a ***specific data value***," as Dr. Goodrich admitted during his deposition. SUF ¶ 73 (Ex. E, Goodrich Dep., Tr.  227:10-17 ("Q. So I just want to break this answer down. So we agree that the target table does not show how a particular attribute -- I think what you called it is an individual value, how that's going to change; right?  A. That's right.  How particular values change to other values is not reflected in the target table."); *id.* at 203:18-23 ("[J]ust to be clear, the target table does not show whether or not a certain attribute that was a 5 is going to change to a 6, for example.  It does not include that kind of information.")).   Instead, Dr. Goodrich's opinion is that the V3 target table includes, at most, information as to what changes are ***acceptable to a group of data values as a whole*** and collectively. SUF ¶ 74 (*Id.* at 216:23-217:1 ("So the prediction isn't of individual values changing from, like, a 5 to a 6.  It's about how things happen in concert and in collections."); *id.* at 214:6-11 ("As I've been explaining all along, the way the V3 algorithm works, it's not on a value-by-value basis.  It's on this permutation basis.  So the predictions are always about how changes to data attributes occur in concert, not individually."); *id.* at 225:19-20 ("It's all about things in concert, not individually.")).   But information regarding changes that are acceptable to a group of data values as a

whole is not within the scope of the plain and ordinary meaning of mSIGNIA's claims, as mSIGNIA itself has stated.

**B.    The V3 Prototype Does Not Infringe Any Asserted Claim Because The Alleged Information Regarding Anticipated Changes Is Not "Stored for an Identity" Or "Associated with" Any Identity**

The V3 prototype does not infringe any Asserted Claim for the additional, independent reason that the V3 target table is not "stored for an identity" or "associated with" any identity.  Nor could it be.  The V3 target table is in no way associated with, linked to, or otherwise stored in connection with any particular identity.  SUF ¶ 54.  Rather, as mSIGNIA's expert has admitted, there was just one V3 target table in the system, regardless of how many identities there were:

> Q.   But there's not – so when V3 is running like when it was running in beta, it used one target table; right?
>
> A.   That's my understanding, yes.
>
> Q.   Okay.  We would agree that there's one single target table that applies to all identities; right?
>
> A.   Yes.  That's right.
>
> Q.   So there's no factual dispute to say whether a unique target table exists for each ID; right?
>
> A.   That sounds right.  That sounds right, as I sit here today.

SUF ¶ 81.  There is no dispute, as Dr. Goodrich testified, that the V3 target table applied just the same across all identities.  Accordingly, it was not individualized for any particular user:

> Q. There's one target table, and that target table is not individualized for any particular user; right?
>
> A. That's right.

SUF ¶ 80.  The V3 target table was in this way completely agnostic to the identity being evaluated, and it cannot be said to be "stored for" or "associated with" any identity.

In the V3 prototype, the only information stored "for an identity" or "associated with" any identity were the historical data values associated with a

-15-

particular InBrowserID.  There was no information stored regarding whether, when, how, or why these attribute data values may change in the future.  SUF ¶¶ 73-74 (Ex. F, Traynor Rebuttal Report at ¶ 153).

Confirming that the plain and ordinary meaning of "stored for an identity" requires an association between an identity and the information regarding anticipated changes stored for it, named inventor Mr. George Tuvell testified that in the system he and his co-inventor invented, anticipated changes are *particular to* an individual user:

> Q. And this is true of the system that you and Mr. Miller invented as well, right, that the anticipated changes are particular to an individual user, right?
>
> [Attorney objection omitted]
>
> THE WITNESS: Yes."

SUF ¶ 4; *see also* SUF ¶¶ 5-6 (Ex. L, Tuvell Dep., Tr. at 77:17-78:6).

There is no genuine issue of material fact that the V3 prototype did not store the V3 target table in connection with any specific identity.  Instead, mSIGNIA makes a legal argument that so long as the V3 target table is stored and used by the system in some matter, that is sufficient to meet the "stored for an identity" limitation.  But mSIGNIA is incorrect because under the plain meaning of "stored *for an identity*," merely "storing" the information in any manner is not sufficient to meet the claim language.  Indeed, reading this limitation on a system that merely stores the alleged information in a general manner unrelated to any identity, as mSIGNIA attempts to do, would improperly ignore the "for an identity" limitation. *Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*, 206 F.3d 1408, 1415 (Fed. Cir. 2000) ("Absent any limitation of a patent claim, an accused device cannot be held to literally infringe the claim.").

**C.     The V3 Prototype Does Not Infringe Any Asserted Claim Because It Does Not Include Functionality For "Recognizing That The Presentation Of Identity Information By The Computer Is Authentic" Or Is Not Authentic**

The V3 prototype does not infringe any Asserted Claim for the additional reason that it does not include functionality for "recognizing that the presentation of identity information by the computer is authentic, according to whether the computer has provided an allowable response to the challenge" as required by Claim 1.   Claim 25 has a materially equivalent limitation of "recognizing that the presentation of identity information by the first computer is authentic, according to whether the first computer has provided an allowable identity claim," for which the argument herein applies equally.

The V3 prototype did not determine whether the presented identity information was authentic (*i.e.,* genuine) or not authentic, and it did not do so on the basis of whether the presented information was allowable or not.   Rather, the V3 prototype *always* assigned an identifier to the presented information – either a new ID (InBrowserID) or a previously stored one.   SUF ¶ 77.   This was true regardless of whether browser information presented to the V3 prototype was authentic or was not authentic.   SUF ¶ 78.   Accordingly, the V3 prototype did not "recogniz[e] that the presentation of identity information by the computer is authentic, according to whether the computer has provided an allowable response to the challenge."

Further, there is no evidence of any of the three beta-testing customers using the V3 InBrowserID to authenticate any user.   SUF ¶ 48 (Ex. E, Goodrich Dep. Tr., 184:12-18, 188:8-25).   That is not surprising, given that during the beta-testing of the V3 prototype the V2 InBrowser commercial product (what customers actually used in connection with authenticating transactions) was running in parallel with the V3 prototype.   SUF ¶ 43.

-17-

### D.   mSIGNIA Has Failed To Show Infringement Under The Doctrine Of Equivalents And Any Indirect Infringement

Although mSIGNIA alleges infringement under the doctrine of equivalents in its Complaint (Dkt. 1 ¶ 28) and its infringement contentions (Ex. B at 2), mSIGNIA's technical expert witness, Dr. Goodrich, does not offer any opinion of infringement under the doctrine of equivalents.  SUF ¶ 15.  InAuth's technical expert, Dr. Patrick Traynor, set forth in his Report and Declaration the reasons why the V3 prototype is substantially different from the Asserted Claims and does not infringe under the doctrine of equivalents.  SUF ¶ 16.  Dr. Traynor's opinions stand unrebutted.  Summary judgment should be granted accordingly.

mSIGNIA did not allege indirect infringement in its Complaint (Dkt. 1 at ¶¶ 22-29) and Dr. Goodrich does not offer any opinion that the V3 prototype  indirectly infringes any Asserted Claim.  SUF ¶ 14.  Dr. Traynor's opinions regarding lack of indirect infringement thus stand unrebutted.  SUF ¶ 17.  Summary judgment should be granted accordingly.

In view of mSIGNIA's failure to adduce any evidence to support a claim of infringement under the doctrine of equivalents or indirect infringement, InAuth respectfully requests that the Court grant summary judgement of no indirect infringement and no infringement under the doctrine of equivalents.

## V.   CONCLUSION

For all the foregoing reasons, InAuth respectfully requests that the Court grant its motion for summary judgment of non-infringement and enter judgment dismissing mSIGNIA's sole remaining infringement claim, with prejudice.

Should the Court grant its Motion, InAuth respectfully notes that it intends to move, pursuant to Local Rule 54-10 and 35 U.S.C. § 285, for an award of its reasonable attorney fees and costs in connection with mSIGNIA's conduct of this litigation – particularly its waiting to withdraw its infringement claims against InAuth's Commercial Products until the eve of infringement expert reports.  InAuth

-18-

1  made available for inspection the source code for the InAuth Commercial Products

2  and the V3 prototype on January 4, 2018.  It is apparent from that source code that

3  the Commercial Products (and the V3 prototype) do not store or use information

4  regarding anticipated changes.  At the latest, mSIGNIA should have withdrawn its

5  infringement claims against the Commercial Products (and the V3 prototype) shortly

6  after the Court issued its Claim Construction Order on June 6, 2018 (Dkt. 43),

7  having had more than five months to inspect source code and understand that

8  InAuth's products cannot infringe any Asserted Claim.

9

10  DATED: November 12, 2018    Respectfully submitted,

11                                        By  /s/ Matthew Robson

12                                        QUINN EMANUEL
                                          URQUHART & SULLIVAN, LLP

13                                        Peter J. Armenio
                                          Matthew D. Robson

14                                        Seung Woo Hur
                                          51 Madison Avenue, 22nd Floor

15                                        New York, New York 10010
                                          Telephone:  (212) 849-7000

16                                        Facsimile:  (212) 849-7100

17

18                                        QUINN EMANUEL
                                          URQUHART & SULLIVAN, LLP

19                                        Michelle A. Clark
                                          50 California Street, 22nd Floor

20                                        San Francisco, California 94111
                                          Telephone:  (415) 875-6600

21                                        Facsimile:  (415) 875-6700

22

23                                        QUINN EMANUEL
                                          URQUHART & SULLIVAN, LLP

24                                        Miles D. Freeman
                                          865 S. Figueroa Street, 10th Floor

25                                        Los Angeles, California 90017
                                          Telephone:  (213) 443-3000

26                                        Facsimile:  (213) 443-3100

27

28                                        Attorneys for Defendant InAuth, Inc.

-19-