QUINN EMANUEL
URQUHART & SULLIVAN, LLP
Peter J. Armenio
Matthew D. Robson
Seung Woo Hur
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

QUINN EMANUEL
URQUHART & SULLIVAN, LLP
Michelle A. Clark
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700

QUINN EMANUEL
URQUHART & SULLIVAN, LLP
Miles D. Freeman
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Defendant InAuth, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

mSIGNIA, Inc.

        Plaintiff,

        vs.

InAuth, Inc.

        Defendant.

Case No. 8:17-cv-01289-AG-KES

**DEFENDANT INAUTH, INC.'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

Date: January 7, 2019
Time: 10:00 a.m.
Hon. Andrew J. Guilford
Courtroom 10D

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ..................................................................................... 1

II.  REPLY TO MSIGNIA'S FACTUAL BACKGROUND ................................. 3

III.  ARGUMENT ......................................................................................... 4

  A.  The V3 Prototype Did Not Infringe Any Claim Because the V3
     Target Table Was Not "Stored for an Identity" or "Associated
     With" Any Identity ..................................................................... 4

     1.  mSIGNIA Admits the Material Facts Showing the V3
        Prototype Did Not Meet These Limitations ......................... 4

     2.  None of mSIGNIA's Opposition Arguments Show
        Otherwise .......................................................................... 5

  B.  The V3 Prototype Does Not Infringe Any Claim Because It Does
     Not Include Functionality for Performing the "Recognizing . . ."
     Step ........................................................................................... 8

     1.  mSIGNIA Admits the Material Facts Showing the V3
        Prototype Does Not Meet This Limitation ......................... 8

     2.  None of mSIGNIA's Opposition Arguments Show
        Otherwise .......................................................................... 9

  C.  The V3 Prototype Does Not Infringe Any Claim Because It Does
     Not Store Any "Information Regarding Anticipated Changes to
     the One or More Stored Data Values Associated with that
     Identity" ................................................................................. 10

     1.  mSIGNIA's Admissions Confirm the V3 Prototype Is a
        Backwards-Looking System That Evaluates Changes Only
        After They Occur .............................................................. 11

     2.  The Only Form of Alleged "Prediction" mSIGNIA
        Identifies in the V3 Prototype Is Not "Information
        Regarding Anticipated Changes" to Data Values ................. 13

     3.  mSIGNIA's Reliance on the Alleged "Machine Learning"
        and "Predictive Analysis" Used to Create the V3 Target
        Table Is Misplaced ........................................................... 14

  D.  mSIGNIA's Arguments Regarding Portions of Dr. Traynor's
     Testimony Are Irrelevant and Incorrect .................................... 15

E. mSIGNIA Has Failed to Show Infringement Under the Doctrine of Equivalents or Any Indirect Infringement ........................................ 16

IV. CONCLUSION ............................................................................................ 16

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bayer AG v. Elan Pharm. Research Corp.*,
  212 F.3d 1241 (Fed. Cir. 2000)................................................................8

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006).................................................................9

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002).................................................................4

*E-Pass Techs., Inc. v. 3com Corp.*,
  No. C-00-2255-DLJ, 2006 U.S. Dist. LEXIS 98257
  (N.D. Cal. Nov. 21, 2006).....................................................................13

*Gen. Mills, Inc. v. Hunt–Wesson, Inc.*,
  103 F.3d 978 (Fed. Cir. 1997).................................................................5

*Gentex Corp. v. Donnelly Corp.*,
  69 F.3d 527 (Fed. Cir. 1995)...................................................................6

*I.E.E. Int'l Elecs. & Eng'g, S.A. v. TK Holdings Inc.*,
  54 F. Supp. 3d 776 (E.D. Mich. 2014)...................................................13

*Jonsson v. Stanley Works*,
  903 F.2d 812 (Fed. Cir. 1990).................................................................6

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)...............................................................................3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).............................................................................10

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005)...............................................................6

*Merck & Co. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005)...............................................................9

*Novartis Corp. v. Ben Venue Labs., Inc.*,
  271 F.3d 1043 (Fed. Cir. 2001).............................................................10

*Sartor v. Ark. Nat. Gas Corp.*,
    321 U.S. 620 (1944) ...........................................................................................15

*Shaw Indus. Grp., Inc. v. Automated Creel Sys., Inc.*,
    817 F.3d 1293 (Fed. Cir. 2016)............................................................................8

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
    374 F.3d 1151 (Fed. Cir. 2004).........................................................................15

*Summit Tech., Inc. v. Nidek Co.*,
    363 F.3d 1219 (Fed. Cir. 2004).........................................................................13

## <u>Statutory Authorities</u>

35 U.S.C. § 271 ...........................................................................................................3

# I.   INTRODUCTION

In its opening brief, InAuth showed that its failed and discontinued V3 prototype – the only remaining accused product in this case – did not satisfy any of three separate claim limitations.  Specifically, InAuth showed that the V3 prototype did not:  (1) store any "information regarding anticipated changes"; (2) store the alleged information regarding anticipated changes in a manner such that it was "associated with" or "stored for an identity"; and (3) "recogniz[e] that the presentation of identity information by the computer is authentic."  V3's failure to satisfy any one of these limitations would warrant summary judgment of non-infringement.  In its opposition, mSIGNIA admits the material facts supporting summary judgment on two of these claim limitations (namely that the V3 prototype does not meet the "stored for"/"associated with" an identity limitations or the "recognizing . . ." limitation).  While mSIGNIA purports to raise disputes of fact regarding the "information regarding anticipated changes" limitation, its arguments are misdirected and fail to raise any genuine dispute of material fact.

Given that mSIGNIA admits the material facts supporting summary judgment on the "stored for an identity"/"associated with" an identity limitations and the "recognizing . . ." limitation, InAuth addresses those limitations first, before turning to the "information regarding anticipated changes" limitation.

*First*, in its opening brief, InAuth explained how the V3 target table is not "stored for an identity" or "associated with" an identity.  This is because there is just one generic target table in the V3 prototype regardless of how many identities there are stored in the system, and the V3 target table applies just the same across all the identities.  In its opposition, mSIGNIA admits these dispositive facts.  Dkt. 131-2 ¶ 79 (admitting "V3 had one common target table that was used for all of its operations"), ¶ 80 (admitting that "[t]he single target table applied commonly to all identities and was not individualized for any particular user"), ¶ 53.  Because the V3 target table is not stored in connection with or associated with any identity, it

cannot, as a matter of law, meet the "stored for an identity" or "associated with" an identity limitations under their plain and ordinary meaning.

*Second*, the V3 prototype did not include functionality for "recognizing that the presentation of identity information by the computer is authentic, according to whether the computer has provided an allowable response to the challenge." As InAuth explained in its opening brief, *any* "presentation of identity information" is given an InBrowserID; the V3 prototype was not able to deem a presentation of identity information inauthentic and decline to provide it with an InBrowserID. In its opposition, mSIGNIA unequivocally admits the dispositive fact that the V3 prototype *always* returns an InBrowserID in response to receipt of identity information. Dkt. 131-2 ¶ 77 (admitting that "in response to receipt of a browser fingerprint, the V3 system would always return to the customer an InBrowser ID for the browser (either a new one or one previously stored)"). Given this undisputed fact, the V3 prototype does not and cannot meet the "recognizing . . ." limitation as a matter of law.

*Third*, as set forth in InAuth's opening brief, the V3 prototype was a purely backwards-looking system and did not store any "information regarding anticipated changes to one or more of the stored data values associated with that identity." In its opposition, mSIGNIA admits the V3 target table does *not* contain any information regarding how a particular browser attribute value is going to change in the future. Dkt. 131-2 ¶ 73 ("[T]he target table does not contain any prediction of how a particular browser attribute's value is going to change.") (emphasis omitted). Despite its admission, mSIGNIA argues that InAuth documentation stating that the V3 target table reflects "a prediction as to whether a particular diff[er]ence vector represents a returning browser or a new browser" creates a dispute of fact as to this limitation. Dkt. 131-2 ¶ 83. Not so. To the contrary, mSIGNIA's cited documents confirm the type of "prediction" mSIGNIA's infringement case rests on is not the type of prediction or anticipation claimed in the '852 patent. As the InAuth

document states, the "prediction" contemplated in the V3 target table relates only to whether the browser being evaluated is a new or returning browser and is made only **after** the changes have occurred and been detected by V3. Critically, it is **not** a prediction or any other information regarding changes to the "one or more of the stored data values associated with [an] identity" that will occur in the future, which is what the claims require.

For all these reasons, as explained in its opening brief and below, InAuth respectfully requests that the Court grant its motion for summary judgment of non-infringement.

## II. REPLY TO MSIGNIA'S FACTUAL BACKGROUND

InAuth addresses below the statements made by mSIGNIA in its Background section that relate to the summary judgment motion before the Court. InAuth does not address mSIGNIA's statements that are not relevant to the pending motion, many of which are unsupported or incorrect, but in focusing its reply does not acquiesce or accede to any of mSIGNIA's statements.

In its opposition, mSIGNIA repeats its assertion that InAuth is planning to infringe in the future – an assertion this Court noted is purely speculative in its December 7, 2018 Tentative Order. Tentative Order at 5. Indeed, as mSIGNIA all but admits, its current suit is directed to InAuth's future products, which mSIGNIA speculates may infringe. Dkt. 131-1 ("Opp.") at 5. But there is no Article III standing for such a claim, as no injury can be caused by products that do not exist. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). Nor do the patent laws permit suits against hypothetical future infringement. 35 U.S.C. § 271 ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.").

mSIGNIA asserts that an injunction could issue to prevent speculative future infringement. But those assertions are meritless and invite the Court to commit

legal error.  The V3 prototype does not infringe for, at least, the reasons stated herein.  But more than that, InAuth removed the V3 prototype code from its source code base months ago, as mSIGNIA admits.  Dkt. 93 at 25 ("They say they took the product out of the source code. Yeah, that's true, they did . . . .").  As a result, there is nothing to enjoin even if the failed six-week beta test in 2017 were found to have infringed (which it did not, as set forth below).

## III.   ARGUMENT

InAuth respectfully requests summary judgement of non-infringement because, based on the undisputed facts, no reasonable juror could find that the failed V3 prototype met any of the three claim limitation addressed below.  *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002).

### A.   The V3 Prototype Did Not Infringe Any Claim Because the V3 Target Table Was Not "Stored for an Identity" or "Associated With" Any Identity

#### 1.   *mSIGNIA Admits the Material Facts Showing the V3 Prototype Did Not Meet These Limitations*

As InAuth set forth in its opening brief, and mSIGNIA does not dispute, the only alleged information regarding anticipated changes in the V3 prototype is the V3 target table.  Accordingly, for the V3 prototype to infringe, the V3 target table must be  "stored for an identity" and "associated with" an identity under the plain and ordinary meaning of those terms.

There is no genuine dispute regarding the technical operation of the V3 product with respect to these limitations, including because mSIGNIA admits the material facts.  The admitted – and dispositive – facts are as follows:

- V3 had one common target table that was used for all of its operations, regardless of how many identities were in the system (Dkt. 131-2 ("SDF") ¶ 79);

- The single target table applied commonly to all identities and was not individualized for any particular user (SDF ¶ 80);

- The V3 prototype did not store unique target tables in connection with each identity (SDF ¶ 81);

- The V3 target table was not stored in the database containing identity information (InBrowserIDs and associated data values) (SDF ¶ 53), but rather was stored as part of a "standalone" binary file (Opp. at 15).

As the Federal Circuit instructs, "[w]here the parties do not dispute any relevant facts regarding the accused product . . . but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *Gen. Mills, Inc. v. Hunt–Wesson, Inc.,* 103 F.3d 978, 983 (Fed. Cir. 1997). That is the case here.

As set forth in InAuth's opening brief, the V3 target table is a type of "grading sheet" that applies the same way to all identities. SDF ¶ 79. It tells the system whether an incoming fingerprint should be graded to correspond to a new or returning device based on what attributes match and do not match historical values. SDF ¶¶ 63-65, 75-76. The target table "grading sheet" is not "stored for" or "associated with" an identity. Indeed, the "grading sheet" is not even stored in the database with the identity information – or any database at all – as is undisputed. SDF ¶ 53; Opp. at 15.

2.  *None of mSIGNIA's Opposition Arguments Show Otherwise*

In its opposition, mSIGNIA argues that: 1) InAuth is advancing a new claim construction argument; 2) mSIGNIA's inventor's testimony that anticipated changes in his system are "particular to" individuals should be disregarded; 3) these limitations are met because the system "applies" the V3 target table to the identities; 4) InAuth's purported claim construction would read-out from the scope of the claims a preferred embodiment; and 5) InAuth's construction is inconsistent with its arguments presented in an IPR that was not instituted. None of these arguments have any merit.

*First*, InAuth relies on only the plain and ordinary meaning of "stored for an identity" and "associated with" an identity. Accordingly, there was no reason for

InAuth to seek any construction during *Markman* proceedings, as the parties were in agreement that plain meaning would apply to these claim terms.

*Second*, mSIGNIA seeks to disavow the testimony of a named co-inventor of the '852 patent, Mr. George Tuvell, that in the system he invented "anticipated changes are particular to an individual user" and that "stored with an identity are predictions for how data associated with that particular identity will change in the future." SDF ¶¶ 4-6. While InAuth believes these aspects of the alleged invention are manifest in the plain words of the claim terms themselves, the Federal Circuit has noted that inventor testimony may be relevant to interpreting claim terms and, here, Mr. Tuvell's testimony confirms the plain and ordinary meaning of the terms. *Gentex Corp. v. Donnelly Corp.*, 69 F.3d 527, 530 (Fed. Cir. 1995); *Jonsson v. Stanley Works*, 903 F.2d 812, 821 (Fed. Cir. 1990); *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1317 (Fed. Cir. 2005).

*Third*, mSIGNIA appears to contend that the V3 target table is "stored for an identity" because "there is no dispute the target table applies to an identity." Opp. at 19. mSIGNIA impermissibly conflates storage with use. These are necessarily separate concepts, however, as Claim 1 (and Claim 25) separately recite "storing" information regarding anticipated changes in a specific manner and, later in the claim, a separate step of "using" that stored information regarding anticipated changes. *See* '852 patent, Claims 1, 25. How the V3 target table is *applied* says nothing about how it is stored, much less whether it is stored in the specific manner required by Claims 1 and 25.

*Fourth*, the plain meaning of the "stored for an identity" and "associated with" claim limitations would not, contrary to mSIGNIA's argument, read-out a preferred embodiment. As an initial matter, the '852 patent does not describe any embodiment as a "preferred" embodiment. But more fundamentally, the embodiment mSIGNIA relies on merely confirms that the information regarding anticipated changes is in fact stored *for an identity* and *associated with* that identity.

mSIGNIA cites the embodiment wherein the information regarding anticipated changes includes information regarding industry updates to data values (*e.g.,* information that a new version of Android was released). Even in this embodiment, the information regarding industry updates is stored *in connection with particular devices*. For example, Figure 2 depicts the minutia database for a particular device ("Current Device Image") and its corresponding anticipated minutia in the anticipated minutia DB:



'852 patent at Fig. 2A (annotated). As shown above, the *particular* device has 70 firmware minutia data values and thus for this *particular* device there are 70 firmware minutia data types in the anticipated minutia database. *See also* '852 patent at 12:55-67 ("All other computer minutia values remaining the same, a change at the F1 index from a value of F1A to F1B, for example, represents one permutation of **computer minutia possible for a specific type of computer 18** (*e.g.,* for computers running the Android operating system). . . ."). That the anticipated changes stored in this database are obtained from catalogs of industry updates does not change the fact they are stored in connection with a specific identity.

*Fifth*, the fact that InAuth did not offer a non-plain meaning construction for these limitations during the IPR proceedings is of no moment here. InAuth is

applying the plain and ordinary meaning of the claim terms, and there was no need to advance any particular construction for these terms as the parties were in agreement they should be given their plain meaning constructions. Moreover, the IPR was denied and, accordingly, InAuth disputes that it has any relevance to this litigation. *See Shaw Indus. Grp., Inc. v. Automated Creel Sys., Inc.*, 817 F.3d 1293, 1300 (Fed. Cir. 2016) (holding that IPR estoppel does not apply to the petitioner because the PTO denied the petition).

### B. The V3 Prototype Does Not Infringe Any Claim Because It Does Not Include Functionality for Performing the "Recognizing . . ." Step

#### 1. *mSIGNIA Admits the Material Facts Showing the V3 Prototype Does Not Meet This Limitation*

As InAuth explained in its opening brief, the V3 prototype did not infringe for a second, independent reason:  because it did not include any functionality for "recognizing that the presentation of identity information by the computer is authentic, according to whether the computer has provided an allowable response to the challenge" as required by Claim 1 and as required by a materially equivalent limitation of Claim 25.  mSIGNIA's opposition confirms that there is no dispute as to the material fact that V3 ***always*** returns an InBrowserID – either an existing one or a new one – in response to ***any*** browser fingerprint information (*i.e.*, presentation of identity information).  SDF ¶ 77.  Accordingly, the V3 prototype, as a matter of law, cannot meet this limitation.  *See Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000) (there is no literal infringement as a matter of law when "claim limitation is absent from the accused device").

As a logical matter, ***always*** assigning an InBrowserID cannot constitute "determining whether the response is ***allowable***" or "recognizing that the presentation of identity information is ***authentic***."  For there to be a "determination" there has to be a set of facts that could lead to one outcome versus another.  Here,

there is only one outcome – assigning an InBrowserID – and thus no need for, or functionality to accomplish, the required determination.

### 2.   None of mSIGNIA's Opposition Arguments Show Otherwise

In its Opposition, mSIGNIA advances two arguments for why the V3 prototype allegedly meets the "recognizing . . ." limitation.  Neither has merit.

*First*, mSIGNIA appears to argue (*see* Opp. section 5.5.1) that because the claim terms recite only the affirmative (*recognizing* when there is an *allowable* response), they do not require the system to deny credentials when the response is not allowable.  This argument contradicts the plain language of the term, which recites that the recognition must be "according to whether the computer has provided an ***allowable*** response to the challenge." '852 patent at Claims 1, 25 (emphasis added).  A claim term requiring an "allowable response" necessarily means that there must be a response that is not allowable.  Otherwise, the claim term "allowable" would be superfluous.  *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").  mSIGNIA's strained interpretation would render superfluous the express term "according to whether the computer has provided an allowable response to the challenge." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").

*Second*, mSIGNIA cites excerpts from various InAuth documents that it contends show V3 meets this limitation.  Three of these statements simply refer to the undisputed fact that the V3 prototype identified browsers.  Opp. at 24-25 (citing "Ex. G (IA01_00005669)," "Ex. W (IA01_00005330) at 5332," and "Ex. K (Goodrich Dep. Tr.) at 144:11-18").  This fact supports summary judgement because the V3 prototype's role was in fact to always assign an identifier to the presentation of any browser identity information.  Regarding the statement that V3 allegedly could provide "statistical differentiation between legitimate data and lies," excerpted

from a slide deck dated 2015, mSIGNIA and its expert present no explanation of how V3 allegedly did this, and whether the accused version of V3 (*i.e.*, which was beta-tested after issuance of the '852 patent in January of 2017) actually implemented any such functionality.  In any event, it is *undisputed* that the accused 2017 V3 prototype *always* returned an InBrowserID in response to the presentation of browser identity information.  Similarly for the statement in a presentation that "InBrowser AI" had the advantage of "Strong 2FA," mSIGNIA fails to present any developed evidence or argument as to why these statements would create any genuine dispute as to a material fact.

It is worth noting the InAuth made the V3 prototype source code available for inspection by mSIGNIA.  Given the availability of that source code, cherry picking untethered sound bites cannot create a genuine issue of material fact regarding V3 and how it worked.  *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1054 (Fed. Cir. 2001) (affirming district court's grant of summary judgment of non-infringement because non-movant's evidence was "no more than theoretical speculation raising, at best, a 'metaphysical doubt as to the material facts'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).  The V3 source code is clear and unequivocal:  V3 always assigned an InBrowserID and did not have the ability to make any determination that would result in the refusal to provide that ID.

**C.    The V3 Prototype Does Not Infringe Any Claim Because It Does Not Store Any "Information Regarding Anticipated Changes to the One or More Stored Data Values Associated with that Identity"**

As explained in InAuth's opening brief, the V3 prototype did not meet the limitation requiring "information regarding anticipated changes to the one or more stored data values associated with that identity."  As the Court has explained, the plain meaning of this term is "directed to something different than using backwards-looking information about changes after they occur to make an evaluation."  Dkt. 43 at 9.  The Court noted that it did not appear mSIGNIA disputed this was part of the

-10-

plain meaning.  Confirming the parties were in agreement on this matter, the Court asked mSIGNIA counsel whether this limitation "excludes solely evaluating changes after they occur," and mSIGNIA's counsel agreed.  Dkt. 44 at 17:21-18:2.

In its opposition, however, mSIGNIA seeks to withdraw its representation to the Court and argues that because the Court declined to expressly construe the claim term as "directed to something different than using backwards-looking information about changes after they occur to make an evaluation" the claims may cover such a backwards-looking system.  *See* Opp. at 6.  This misapprehends what InAuth understood to be the basis of the Court's ruling, and which InAuth believes the Court made quite clear:  under the plain meaning of the term it is directed to something other than backwards-looking information about changes after they occur to make an evaluation, thus there was no need to incorporate this particular aspect of the plain meaning into the construction.  mSIGNIA's attempt to contort this basic aspect of the plain meaning of the term is exactly the type of "mischief" InAuth was concerned about during the *Markman* process.  Dkt. 43 at 9.

As explained in more detail below, under the Court's plain meaning construction and in light of the undisputed facts, the V3 prototype does not infringe because it was a backwards-looking system that evaluated changes only ***after*** they had occurred.

> 1.   *mSIGNIA's Admissions Confirm the V3 Prototype Is a Backwards-Looking System That Evaluates Changes Only After They Occur*

In its Statement of Disputed Facts, mSIGNIA does not genuinely dispute the steps in the process the V3 prototype used to assign an identifier (InBrowserID) to a browser.  These five steps confirm that the V3 prototype performed *only* a backwards-looking analysis of changes *only* after they had occurred, and are as follows:

1. When V3 receives a new observation from a browser, V3 attempts to find a historical observation that matches all pertinent attributes exactly (SDF ¶ 60);

2. If an exact match is found, V3 retrieves from the database and returns an InBrowserID associated with the most recent such historical observation (SDF ¶ 61);

3. If certain attributes in a new observation do not match those of the historical observation, V3 computes a "difference vector" (SDF ¶ 62);

4. The difference vector is created by performing an attribute-by-attribute comparison of certain attributes in the new observation with those of the historical observation and indicates whether each attribute did or did not match exactly its historical value (SDF ¶¶ 63-64);

5. V3 then uses the target table to determine whether the generated difference vector indicates the browser is new or returning. The "target table included 'all possible' difference vectors" (SDF ¶ 65).

As shown by the progression of the undisputed steps, the V3 prototype worked by comparing an incoming fingerprint to a historical one and – attribute by attribute – determining which if any did not match history. In this way a difference vector listing which attributes matched and which did not was created. The difference vector for a particular browser was necessarily created *only after* the changes occurred to that browser's attributes, confirming the V3 prototype could evaluate changes *only* after they occurred.

As a last step in this backwards-looking analysis, the target table "grading sheet" was consulted to instruct the system whether, given the number and type of mismatches, the system should assign a new ID or a previously stored one. As mSIGNIA notes in its SDF, the V3 target table listed every possible difference vector and whether for that difference vector the system should conclude the browser is new or one it has seen before. SDF ¶ 66. It is only *after* any changes have occurred and a difference vector generated that the system  determined which

row to look-up in the target table grading sheet for instructions on whether to give a new ID or assign an old one.  Nothing in the system was predicted or anticipated ex ante.  It was all backwards-looking.

> 2. *The Only Form of Alleged "Prediction" mSIGNIA Identifies in the V3 Prototype Is Not "Information Regarding Anticipated Changes" to Data Values*

In its opposition, mSIGNIA focuses on the fact that InAuth documents allegedly describe the V3 target table as containing "a prediction as to whether a particular difference vector represents a returning browser or a new browser."  Dkt. 131-10 at 4.  But the "prediction" as to whether a browser is new or returning occurs only *after* the changes to the browser have occurred and been identified by V3.  Specifically, *after* the changes have occurred and the system has determined which data values match and do not match their historical values, the V3 target table is consulted to evaluate whether a browser should be considered new or returning based on which attributes matched and which did not match their historical values.  SDF ¶¶ 65, 68.  In this way it was a static "grading sheet" for evaluating changes *after* they occurred to determine if they are so extensive that the browser should be considered a new browser.  But, a "prediction" as to whether a device is new or returning made after the relevant changes have already occurred is not the claimed form of prediction, which concerns "anticipating what minutiae might do in the future as opposed to evaluating changes after they occur."  Dkt. 43 (Claim Construction Order) at 8; *see, e.g., E-Pass Techs., Inc. v. 3com Corp.*, No. C-00-2255-DLJ, 2006 U.S. Dist. LEXIS 98257, at *47-49 (N.D. Cal. Nov. 21, 2006) (holding that excerpts from documents without "specifics which can apply to [the] infringement claims" cannot be considered to be sufficient evidence that proves any element of the infringement claims); *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004) (stating that determining a motion for judgment as a matter of law of noninfringement "requires an examination not merely of isolated

1   snippets of testimony or abbreviated excerpts from documentary evidence divorced

2   from the context in which they appear").

3            3.    *mSIGNIA's Reliance on the Alleged "Machine Learning" and
4                  "Predictive Analysis" Used to Create the V3 Target Table Is
                   Misplaced*

5        In its opposition, mSIGNIA argues that because the V3 target table was

6   created using "machine learning/predictive analysis" this shows it constitutes

7   "information regarding anticipated changes to the one or more stored data values."

8   mSIGNIA's argument fails for at least two reasons.

9        *First*, mSIGNIA fails to present any evidence that use of "machine learning"

10  to create the V3 target table is relevant to infringement.  Indeed the '852 patent does

11  not mention machine learning at all, either in the specification or the claims.  To the

12  contrary, mSIGNIA's expert unequivocally testified that there are "lots of machine

13  learning around the world that would not read on the claims" and that whether an

14  authentication system that used machine learning infringed would "depend[] on all

15  the details".  Ex. R to Reply Robson Decl. at 125:4-126:10.  And as named inventor

16  Dr. Tuvell admitted, he and his co-inventor did not invent use of machine learning

17  in an authentication process.  Ex. S to Reply Robson Decl. at 55:4-17.  Use of

18  "machine learning" in the abstract does not have the talismanic effect of rendering

19  anything created thereby "information regarding anticipated changes."

20       *Second*, as the documents cited by mSIGNIA show, the "predictions" and

21  "predictive analysis" relating to the V3 prototype are at most predictions as to

22  "whether a difference vector represents a new or returning browser."  Dkt. 131-10 at

23  4.  For the reasons detailed above, such a "prediction" is not a prediction regarding

24  future changes to data values as claimed; it is rather a prediction of whether the

25  current fingerprint corresponds to a new browser or one the system has seen before

26  made only after the relevant changes have occurred and been identified in a

27  backwards-looking comparison.

28

**D.    mSIGNIA's Arguments Regarding Portions of Dr. Traynor's Testimony Are Irrelevant and Incorrect**

mSIGNIA argues that InAuth's technical expert witness's testimony should be disregarded in its entirety because he allegedly failed to apply this Court's claim construction order and because he clarified at his deposition what mSIGNIA refers to as "a series of statements in his report relating to the inefficiency of V3." Opp. at 12. But these attempted attacks on Dr. Traynor's testimony are irrelevant to this motion because InAuth is relying on mSIGNIA's *own* expert's (Dr. Goodrich's) declaration and testimony regarding technical operation of the V3 prototype, as well as mSIGNIA's admissions as to crucial facts in its Statement of Genuine Disputes of Fact. This is plain from the fact that all of InAuth's statements of undisputed fact regarding technical operation of the V3 prototype material here are either admitted by mSIGNIA (*see, e.g.*, SDF ¶¶ 46-47, 49, 50-53, 55-60, 65, 69, 75-77, 79-81) or not genuinely disputed and contain supporting citations to *Dr. Goodrich's* own reports or testimony (*see, e.g.*, *id.* ¶¶ 48, 61-64, 66-68, 70, 73, 77-78). Accordingly, mSIGNIA's cited cases are inapposite, as this is not a situation where "the only evidence in support of the movants contention was the testimony of its experts and there were specific bases for doubting the credibility of that testimony." *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158-59 (Fed. Cir. 2004) (citing *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 628-29 (1944)). In any event, neither of mSIGNIA's arguments regarding Dr. Traynor's opinions have merit.

*First*, Dr. Traynor faithfully applied this Court's claim construction order. Dr. Traynor's declaration includes extensive discussion of and analysis regarding this Court's claim construction order, and confirms he applied the Court's constructions. Dkt. 115, Ex. F ¶¶ 37-49. At his deposition, Dr. Traynor agreed that the plain and ordinary meaning of "information regarding anticipated changes" referred to "information *about what* a data value is predicted to change to." Dkt. 131-9 at 30:23-29:4 (emphasis supplied). This accords with the Court's claim

construction order where the Court explained that "[t]he plain meaning of the phrase 'information regarding anticipated changes' would suggest that the database relates to anticipating *what* minutiae might do in the future as opposed to evaluating changes after they occur."   Dkt. 43 at 8 (emphasis added).  Moreover, Dr. Traynor also agreed information about how a data value will change is also within the scope of the plain meaning.  Dkt. 131-9 at 29:4-15.

*Second*, that Dr. Traynor at his deposition clarified certain aspects regarding the details of exactly why V3 was inefficient is of no moment here.  *See* 131-9 at 294:24-295:6.  This motion is not directed to, and does not turn on, the details of why V3 was inefficient.  Tellingly, mSIGNIA does not identify any disagreement between Dr. Traynor and Dr. Goodrich regarding the aspects of V3 relevant to the pending motion for summary judgment.

### E.   mSIGNIA Has Failed to Show Infringement Under the Doctrine of Equivalents or Any Indirect Infringement

mSIGNIA's opposition does not address or dispute the arguments set forth in InAuth's opening brief regarding the absence of any infringement under the doctrine of equivalents and the absence of any indirect infringement.   InAuth's non-infringement under these theories is thus undisputed.   According, InAuth respectfully requests that the Court grant summary judgement of no infringement under the doctrine of equivalents and no indirect infringement no matter how it rules on InAuth's request for summary judgment of no direct, literal infringement.

## IV.   CONCLUSION

For all the foregoing reasons, and the reasons set forth in InAuth's opening brief, InAuth respectfully requests that the Court grant its motion for summary judgement of non-infringement.

DATED: December 12, 2018      Respectfully submitted,

By _/s/ Matthew D. Robson_
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
Peter J. Armenio, P.C.
Matthew D. Robson
Seung Woo Hur
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

QUINN EMANUEL
URQUHART & SULLIVAN, LLP
Michelle A. Clark
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700

QUINN EMANUEL
URQUHART & SULLIVAN, LLP
Miles D. Freeman
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Defendant InAuth, Inc.